1
2
3
4
5
6
7

8 UNITED STATES DISTRICT COURT

9 CENTRAL DISTRICT OF CALIFORNIA

10 WESTERN DIVISION

| | | |
|---|---|---|
| | ) | Case No.  CR 07-497 CAS |
| United States of America | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS |
| vs. | ) | |
| Mark Tyrell Fowlkes | ) | |
| Defendant. | ) | |
| | )- | |

## I.    INTRODUCTION

On June 6, 2007, the government filed an indictment charging defendant Mark Tyrell Fowlkes with (1) possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) (count one); (2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (count two); (3) felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (count three); and (4) possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) (count four).[1]

---

[1] The government filed a first superseding indictment on June 6, 2008.

There are presently three motions before this Court. On March 29, 2008, defendant filed a motion to suppress evidence seized from his automobile and his person on September 13, 2006. On March 31, 2008, defendant filed a motion to suppress wire intercepted communications. On April 1, 2008, defendant filed a motion to suppress evidence seized in a search of his residence conducted on September 4, 2006. The government filed oppositions to each of defendant's motions. Defendant thereafter filed replies to the government's oppositions. The Court heard oral argument on April 30, 2008, and heard testimony from Officer Allen Duncan and Sergeant Jerry Gibbs. The Court also ordered the parties to file supplemental briefing with regard to defendant's motion to suppress wire intercepted communications. The Court then continued the hearing on defendant's motions to May 13, 2008. On May 5, 2008, the government filed its supplemental memorandum in opposition to defendant's motion to suppress wire intercepted communications. On May 7, 2008, defendant filed his supplemental memorandum in support of his motion to exclude wire intercepted communications. The Court held an evidentiary hearing on defendant's motions on May 13, 2008, and May 14, 2008. Thereafter, the matter was taken under submission. After carefully considering the arguments set forth by the parties, the Court denies each of defendant's motions.

## II.   BACKGROUND

The charges against defendant arise from a wiretap investigation of Eddie Lee Smith ("Smith") conducted by the Drug Enforcement Administration ("DEA") and the Long Beach Police Department ("LBPD").[2] On July 19, 2006, the Court, the Honorable Audrey B. Collins, presiding, approved an application to intercept wire communications over a cellular telephone believed to be used by Smith, Target Telephone No. 1. United States v. Seal, Case No. CR 06-0198 ABC, July 19, 2006 Wiretap Order. The application for the

---

[2] Smith is a defendant in a related case before this Court, see United States v. Eddie Lee Smith, Case No. CR 07-498 CAS.

1   order authorizing interception of wire communications was supported by the affidavit of
2   DEA Special Agent Jonathan D. Koeppen.  The wire communications intercepted over
3   Target Telephone No. 1 led S.A. Koeppen to believe that Smith was using multiple
4   telephones, including Target Telephone No. 2, in furtherance of the offense of drug
5   trafficking.   The government then submitted a second application for a wiretap
6   interception. On August 30, 2006, the Court, the Honorable George H. King, presiding,
7   approved an application for continued interception of wire communications over Target
8   Telephone No. 1, and for the initial interception of wire communications over Target
9   Telephone No. 2, for a period not to exceed thirty days.  United States v. Seal, Case No.
10  CR 06-0198 ABC, Aug. 30, 2006 Wiretap Order. On August 31, 2006, wire interceptions
11  commenced on Target Telephone No. 2, and agents learned that defendant was using
12  Target Telephone No. 2 in furtherance of drug trafficking. Prior to the interception of wire
13  communications over Target Telephone No. 2, agents were not aware of the existence of
14  defendant, his alleged involvement in the charged offenses, or his use of Target Telephone
15  No. 2.

16      **A.     EVENTS OF SEPTEMBER 4, 2006**

17      On September 4, 2006, wire communications intercepted over Target Telephone No.
18  2 led agents to be believe that defendant was going to destroy or remove contraband from
19  an  apartment  at  which  agents  believed  defendant  resided.[3]    Based  on  this

20  _____

21      [3] The California Department of Motor Vehicle's ("DMV") records indicated that
22  defendant resided 2936 Olive Avenue, Long Beach, California.  However, based on a
    September 2, 2006 intercepted voicemail agents concluded that defendant lived at 2310
23  Cedar Avenue, Apartment 3 in Long Beach, California.  In this intercepted voice mail
24  defendant stated,

25      HEY JOE. THIS IS MARK OUT AT, UH, 2310 CEDAR, APARTMENT 3.
26      GIVE ME A CALL BACK AND LET ME KNOW IF YOU WANT ME TO
        SEND THE RENT OFF TODAY OR YOU COMING OUT TO PICK IT UP.
27      LET ME KNOW WHAT YOU WANT ME TO DO.  TODAY'S THE
28                                                          (continued...)

3

(...continued)
      SECOND.  HAVE A GOOD DAY.  GIVE ME A CALL.

Opp'n to Mot. to Suppress re: Sept. 4, Declaration of Special Agent Jonathan Koeppen ("S.A. Koppen Decl.") ¶ 4, Ex. A.

      Then, on September 4, 2006, agents intercepted four telephone calls that allegedly led them to believe that defendant was going to immediately remove or destroy contraband from the Cedar Avenue address, where agents believed defendant lived.  At 1:40 p.m. law enforcement intercepted the following call between defendant and a woman later identified as Latoya Marshall:

| | |
|---|---|
| [FOWLKES]: | MAN, WHERE IS YOU AT?  IT'S A 911. |
| [LATOYA MARSHALL]: | I'M IN LA AT NICKY'S HOUSE GETTING MY NIECE THE CAKE. WHAT IS THE EMERGENCY, MARK? |
| [FOWLKES]: | THE HOMIE SAID THE POLICE IS OUTSIDE IN THE BACK OF THIS MOTHERFUCKER, TAKING PICTURE OF THIS CAR.  I WAS GONNA TELL YOU TO TAKE THAT SHIT OVER TO KEISHA'S HOUSE, MAN.  HE SAID THEY'RE BACK THERE.  THE UNDERCOVER, LIKE, THREE DIFFERENT CARS, KEEP HITTING THE ALLEY, KEEP DRIVING THROUGH THE ALLEY, DRIVING THROUGH THE ALLEY.  I TOLD YOU THEY BEEN FOLLOWING ME.  YOU THINK I'M BULLSHITTING. THEY JUST CHIRPED ME AND JUST TOLD ME TO WATCH OUT. |

Id. ¶ 5, Ex. B.  Agents intercepted a second call between defendant and Marshall at 2:05 p.m.:

| | |
|---|---|
| [LATOYA]: | WHAT'S UP? |

                                      (continued...)

1

2

3
(...continued)

    [FOWLKES]:         HEY, PAPA GONE, MAN.  HE'S ON OLIVE.

4
SO UH, WHEN YOU COME BACK, YOU

5
SHOULD MOVE THAT COMPUTER AND THE

REST OF ALL THAT YOU KNOW, JUST GET

6
EVERYTHING OUT OF HERE CAUSE I DON'T

7
KNOW WHAT'S UP.

    [LATOYA]:          ALRIGHT, WELL I'M ON MY WAY BACK HOME

8
RIGHT NOW.

9
    [FOWLKES]:         HEY, THIS NIGGA WENT TO JAIL FOR SOME, UH
. . FOR GTA AND SAID THIS MOTHER FUCKER'S

10
WAS IN THERE ASKING HIM ABOUT ME.

11
    [LATOYA]:          ALRIGHT WELL, I'LL HOLA AT YOU WHEN I GET
THERE [INAUDIBLE]   I'M ON THE FREEWAY

12
RIGHT NOW. [INAUDIBLE] IN A COUPLE OF

13
MINUTES.

14
Id. ¶ 6, Ex. C.

15

16
      Approximately ten minutes later defendant utilized the push-to-talk, two-way radio feature on Target Telephone No. 2 to purportedly inform an individual known as "Robo"

17
that he was going to ensure that there was no contraband in his apartment:

18

19
    [FOWLKES]:       THE SPOT ON 23RD.  SO THEY SAID THEY WAS ON
23RD  (INAUDIBLE)  TAKING  PICTURES  BOTH

20
WAYS.  I'M LIKE, WHAT THE FUCK WAS THEY
DOIN' ALL THAT FOR.

21
    [ROBO]:           THEY TRYIN' TO PUT SOMETHING TOGETHER ON YOU.

22
    [FOWLKES]:       EXACTLY.  I'M NOT GONNA GIVE THEM SHIT TO PUT
TOGETHER ON ME. I'M FITTIN TO TRASH THIS PHONE

23
AND I'M OUTTA HERE.

24
    [ROBO]:           BRO, HEY WAIT, WAIT, WAIT, WAIT. JUST TRASH
THE SIM CARD, NOT THE PHONE.

25
    [FOWLKES]:       OH YEAH, THAT'S RIGHT.

26
    [ROBO]:           WHAT YOU DO IS, UM, MAKE SURE YOU GET MY
NUMBER UP OUTTA THERE SO WHEN YOU DO

27
YOU CAN (INAUDIBLE) ME AND THEN, UM, I'LL

28
(continued...)

1  belief, within an hour of the last call to Robo, DEA agents and LBPD officers arrived at

2  defendant's Cedar Avenue address.[4] According to Officer Greg Brown, he and Detective

3  James Kloss knocked three times on the door to apartment 3. Officer Brown claims that

4  no one opened the door, but that he could hear movement from inside of the apartment.

5  Officer Brown then kicked open the door of the apartment. Upon entry, officers allegedly

6  observed defendant and Marshall in the apartment, and saw a 9mm handgun on a towel at

7

8  (...continued)

                        HAVE A NEW NUMBER OR SOMETHIN'.

9  [FOWLKES]:      I  ALREADY  GOT  THREE  MORE  CHIRPS.

10                         ALREADY. JUST, JUST IN, JUST IN CASE OF SHIT
                       LIKE THIS GO DOWN. I ALWAYS HAD A BACKUP

11                         PLAN.

12  ROBO:          AIGHT. I'M, I'M GONNA HIT YOU FROM OUT IN CHIRP
                       WHEN I GET TO THE WEST AND (INAUDIBLE).

13

14  Id. ¶ 7, Ex. D.

15       Then, approximately one minute later defendant was intercepted in another call with

16  Robo:

17      [ROBO]:       ALRIGHT, MAN.

18      [FOWLKES]:   ALRIGHT, BE CAREFUL, MY NIGGA.

    [ROBO]:       YEAH, I'M POSTED LIKE A STAMP.

19      [FOWLKES]:   YEAH, I CAN'T WAIT TIL I GET TO THAT POSITION. I'M

20                         JUST  MAKIN  SURE  EVERYTHING  CLEAN
                       EVERYWHERE, YOU KNOW WHAT I'M SAYING'?  I

21                         AIN'T GOT SHIT TO SAY ABOUT NOTHIN' BUT SOME

22                         LAWSUITS COMIN' BACK AT THEIR BITCH ASS.

23      [ROBO]:       ALRIGHT MAN. JUST BE CAREFUL MAN, I TOLD YOU
                       (INAUDIBLE).

24      [FOWLKES]:   ALRIGHT, FO' SHO'.

25  Id., Ex. E.

26

27     [4] The DEA agents and LBPD officers are sometimes collectively to herein as

28  "officers."

Marshall's feet. The officers handcuffed defendant and Marshall, and entered various rooms of the apartment purportedly for the purpose of conducting a protective sweep. The officers claim that after they secured they apartment, they waited inside for a search warrant. They represent that they did not however, conduct a full-scale search of the apartment. While the officers were allegedly securing the Cedar Avenue address, Officer Christopher Thue requested and obtained a search warrant for that location from Los Angeles County Superior Court Judge Bradford Andrews. After Officer Thue arrived at the Cedar Avenue address with the search warrant, the officers executed a search. Pursuant to their search, the officers found approximately 2.6 grams of crack cocaine, a loaded 9mm handgun, and a digital scale.

### B.    EVENTS OF SEPTEMBER 13, 2006

On September 13, 2006, Sergeant Jerry Gibbs from LBPD was conducting surveillance of defendant at the Cedar Avenue address. Sgt. Gibbs observed defendant get into a gold Dodge Intrepid, and drive away from the Cedar Avenue address. Defendant stopped to pick up a male passenger, later identified as Kerry Young. After picking up Young, defendant parked alongside the curb at or near the corner of Elm Avenue and 11th Street in Long Beach. Detective Richard Miller of the LBPD joined Sgt. Gibbs on surveillance at this point in time. Sgt. Gibbs and Det. Miller observed an unidentified male approach defendant's car, and engage in what the officers suspected was a narcotics transaction. Defendant then pulled away from the curb, and drove away.

Sgt. Gibbs requested over the police radio that a marked police patrol car conduct a pretextual traffic stop of a gold Dodge Intrepid, with California license plate number 5KMP319. Officer Allen Duncan and his partner Officer T. King responded to the radio call, and pulled over defendant for driving with an expired temporary operating permit from the California DMV. After defendant pulled over, Officer Duncan and his partner ordered defendant and passenger Young to exit the vehicle. Defendant and Young complied with the order. At or about the time that defendant and Young were ordered out of the car, Sgt. Gibbs and Det. Miller arrived on scene. Det. Miller began questioning

defendant, and requested consent to search the car. Defendant refused to provide consent. As he was questioning defendant, Det. Miller walked up to the driver's side door of the Dodge Intrepid. Det. Miller observed what he believed to be marijuana in a panel that ran along the bottom of the driver's side door, which he claims was open. The officers claim that the marijuana was in plain view. Additionally, Det. Miller and Sgt. Gibbs also claim to have observed white, rock-like chips, believed to be cocaine base, on the driver's and passenger's seats of the car. Ultimately, Sgt. Gibbs directed Officer Duncan to arrest defendant for felony possession of cocaine, and possession of marijuana. Officer Duncan complied with his request.

Defendant was then taken to the booking area of the LBPD station. As defendant was being booked, Sgt. Gibbs went to his car to obtain his taser gun. Sgt. Gibbs claims that he did so as a precaution, believing that he might need to use the taser gun if defendant became noncompliant or aggressive.[5] Sgt. Gibbs, Officer Duncan, and a jail custody officer then escorted defendant to an area designated for strip searches. Defendant's handcuffs were removed. The jailer ordered defendant to remove his clothes, bend over, spread the cheeks of his buttocks apart, and cough. Officer Duncan asserts that because defendant only minimally spread his cheeks and coughed, he was asked to do so again. Sgt. Gibbs maintains that he observed defendant slightly spread the cheeks of his buttocks apart, and push the fingers of his right hand into his anus. Sgt. Gibbs then employed his tager gun on defendant's lower back, causing defendant's arms to fly up into the air. The parties dispute what happened next. According to Sgt. Gibbs, he observed a bag protruding from defendant's anus, and he pulled the bag out. Defendant on the other hand contends that Sgt. Gibbs proceeded to insert his fingers into defendant's anus, thereby conducting an unlawful body cavity search.

---

[5] At the hearing, the officers conceded that defendant was not acting physically aggressive towards them. Officer Duncan, however, testified that defendant was being verbally aggressive, and that in his experience, verbal aggression can often escalate to physical aggression.

### III.   DISCUSSION

####   A.   MOTION TO SUPPRESS WIRETAP EVIDENCE

Defendant moves to suppress wiretap evidence. First, defendant argues that the evidence should be suppressed because the application used to secure the wiretap was not executed "under oath of affirmation" as required by 18 U.S.C. § 2518(1). Next, defendant argues that the affidavit in support of the wiretap application contains omissions and material misstatements such that the affidavit fails to establish probable cause as required by the Fourth Amendment to the United States Constitution.

####   1.   STATUTORY COMPLIANCE

Defendant argues that the wiretap evidence should be suppressed because the government failed to comply with 18 U.S.C. § 2518(1). Specifically, defendant contends that although the application states that it was executed by AUSA Samantha Jessner, in fact, it was executed by AUSA Kevin S. Rosenberg who signed the application on behalf of AUSA Jessner. Defendant argues that the application was therefore not made "upon oath or affirmation." 18 U.S.C. § 2518(1).

When the government seeks to conduct surveillance of oral or wire communications, it must comply with the regulatory scheme established by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"). Title III sets out several requirements that must be satisfied before an order authorizing a wiretap will issue. Under Title III, when the government seeks to intercept oral or wire communications, it must first obtain authorization to file an application for a wiretap order from a senior Justice Department official designated in 18 U.S.C § 2516(1). 18 U.S.C. § 2518(1). Once such authorization is obtained, "an investigative or law enforcement officer" may submit an application for an order authorizing the interception to a judge. Id. "Investigative or law enforcement officer" is defined as "any officer of the United States . . . who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter [18 U.S.C. §§ 2510 et seq.], and any attorney authorized by law to prosecute or participate in the prosecution of such offenses." 18 U.S.C. § 2510(7).

18 U.S.C. § 2518 sets forth the procedures for submitting an application for an order to intercept oral or wire communications. This application serves a "purpose [similar] to an application for a search warrant, i.e., to present sufficient information to enable a detached and neutral judicial officer to find that probable cause exists to issue the order or warrant." United States v. Garcia, 785 F.2d 214, 222 (8th Cir. 1986). Thus, the application must contain a "'full and complete statement of the facts relied upon by the applicant to justify his belief' that an order should issue." United States v. Tortorello, 480 F.2d 764, 773 (2d Cir. 1973) (quoting 18 U.S.C. § 2515(1)(b)). The application must also "be made in writing upon oath or affirmation." 18 U.S.C. § 2518(1); see e.g., United States v. Small, 423 F.3d 1164, 1177 (D. Colo. 2005) ("The wiretap statute requires that an application for a wiretap order 'shall be made in writing upon oath or affirmation.'") (quoting 18 U.S.C. § 2518(1)). However, the "oath or affirmation" requirement may be satisfied through a declaration submitted under penalty of perjury. See 28 U.S.C. § 1746.

It is not clear that AUSA Rosenberg could have signed a declaration under penalty of perjury on behalf of AUSA Jessner. However, S.A. Koeppen, who also has authority to apply for a wiretap order, see United States v. Williams, 124 F.3d 411, 424 (3d Cir. 1997), was placed under oath by the court. S.A. Koeppen's sworn affidavit sets forth the facts and circumstances justifying interception of communications over Target Telephone No. 2. Under these circumstances, the Court concludes that the "oath or affirmation" requirement, of both Title III and the Fourth Amendment to the United States Constitution, has been satisfied.

Even if arguendo there has been some statutory noncompliance, that noncompliance does not warrant suppression. Here, defendant seeks suppression pursuant to 18 U.S.C. § 2518(10)(a)(i). Pursuant to 18 U.S.C. § 2518(10)(a), an aggrieved defendant may seek an order to suppress wiretap evidence on the grounds that "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval."

Under certain circumstances, the failure to comply with Title III may render the interception of wire communication unlawful.  However, not "every failure to comply" fully with a requirement provided in Title III "render[s] the interception of wire or oral communications 'unlawful.'"  United States v. Chavez, 416 U.S. 562, 574-75 (1974).  Suppression under Title III "is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement [sic] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary device.'"  United States v. Donovan, 429 U.S. 413, 433-34 (1977) (quoting United States v. Giordano, 416 U.S. 505, 527 (1974)).

In Giordano, the Supreme Court held that wiretap evidence must be suppressed where the Attorney General's Executive Assistant authorized the application for a wiretap order because the Executive Assistant to the Attorney General was not an official empowered by 28 U.S.C. § 2516(1) to authorize applications for wiretap orders.  Giordano, 416 U.S. at 510.  The Court concluded that "[t]he mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order."  Id. at 515-16. The Court reasoned that because "the provision for pre-application approval was intended to play a central role in the statutory scheme . . . suppression must follow when it is shown that this statutory requirement has been ignored."  Id. at 528.

On the other hand, where an appropriate Justice Department official actually approves the application for authorization to request a wiretap order, but is incorrectly identified, suppression is not warranted.  United States v. Chavez, 416 U.S. 562, 579-80 (1974) (concluding that although the application for a wiretap order incorrectly identified an Assistant Attorney General as having approved the application when the application was actually approved by the Attorney General, suppression was not warranted).

1
2
3

In <u>United States v. Sorapuru</u>, 902 F. Supp. 1322 (D. Colo. 1995), <u>aff'd</u> <u>sub</u> <u>nom.</u>, <u>United States v. Bovie</u>, 120 F.3d 271 (10th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1007 (1997), the court explained that

4
5
6
7
8
9
10
11
12

> Strict adherence to [three] procedural steps is a prerequisite to an issuance of a wiretap order. First, a duly authorized law enforcement officer must obtain approval from the United States Attorney General or a specifically designated Assistant Attorney General in order to apply to a federal judge for a wiretap. Second, once such approval is obtained, the officer must present to the judge a written application for a wiretap. Third, the judge must make certain enumerated findings and issue an ex parte order containing specified elements.

13
14

<u>Id.</u> at 1326.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

In this case, the application was properly approved by an official from the Justice Department. Further, S.A. Koeppen's affidavit satisfies every element of 18 U.S.C. § 2518(1): it is in writing and submitted upon oath, identifies S.A. Koeppen as a law enforcement officer within the meaning of 28 U.S.C. § 2510(7), sets forth sufficient facts establishing probable cause, explains that other investigative procedures are inadequate, explains the need for interception, identifies the period of time for which interception is sought, and finally, it identifies all previous applications involving Eddie Lee Smith. Under these circumstances, the Court finds that suppression is not warranted. <u>See</u> <u>e.g.</u>, <u>United States v. Florea</u>, 541 F.2d 568, 576 (6th Cir. 1976) (failure of FBI agent to sign affidavit in support of application for wiretap did not warrant suppression where judge based order on agent's oral sworn statements made in his presence, as well as the written application); <u>Rankings v. Murphy</u>, 198 F. Supp. 2d 3, 8 (D. Mass. 2002) (suppression of wiretap evidence not warranted where district attorney was not formally sworn because there was no showing "that the requirement of a formal oath or affirmation was intended

1   to play a central, or even functional, role in guarding against unwarranted use of

2   wiretapping or electronic surveillance") (internal citations and quotations omitted); <u>United</u>

3   <u>States v. Chavez</u>, 416 U.S. 562, 579 (1979) (misidentification of authorizing Justice

4   Department official does not warrant suppression, where Attorney General in fact gave

5   authorization); <u>United States v. Talbert</u>, 706 F.2d 464, 466-67 (4th Cir. 1983) (finding that

6   although affidavit in support of wiretap order did not indicate that it had been made under

7   oath, affiant's testimony that he signed the affidavit under oath at the same time that the

8   application was verified satisfied Title III and Fourth Amendment's "oath or affirmation"

9   requirements).

10                  **2.     PROBABLE CAUSE SUPPORTING WIRETAP ORDER**

11         Next, defendant moves to suppress wiretap evidence on the basis that S.A.

12   Koeppen's affidavit in support of the wiretap order failed to establish probable cause.

13         Title III permits interception of wire communications only in carefully defined

14   circumstances and requires strict adherence to procedure. <u>United States v. Blackmon</u>, 273

15   F.3d 1204, 1207 (9th Cir. 2001).   Before granting an application approving the

16   interception of wire communications, a court must make several findings based on the

17   facts submitted by the applicant.  18 U.S.C. § 2518(3).

18         Section 2518 of Title 18 the United States Code sets forth the "[p]rocedure for

19   interception of wire, oral, or electronic communications."  18 U.S.C. § 2518.  A law

20   enforcement official must apply to a judge for an order permitting electronic surveillance.

21   18 U.S.C. § 2518(1).  In order to authorize a wiretap, the judge must find that there is

22   probable cause to believe that: (1) an individual is committing, has committed, or is about

23   to commit certain offenses, (2) relevant communications will be intercepted by the wiretap,

24   and (3) the individual who is the focus of the wiretap application will use the target

25   telephone.  18 U.S.C. § 2518(3)(a), (b), (d).  The probable cause standard in the context

26   of electronic surveillance is essentially the same standard of probable cause that governs

27   traditional search warrants. <u>United States v. Brown</u>, 761 F.2d 1272, 1275 (9th Cir. 1990).

28   Accordingly, the court employs a "totality of the circumstances" test. <u>Illinois v. Gates,</u> 462

1  U.S. 213, 238 (1983). An authorizing judge's determination that there is probable cause
2  "should be paid great deference by reviewing courts" and will therefore be upheld on a
3  motion to suppress as long as it is supported by a "substantial basis." Id. at 236, 238.

4      The application for a wiretap order and its supporting affidavit provided a
5  substantial basis for finding (1) that Smith committed, was committing, or would in the
6  future commit the offense of drug trafficking, (2) that Smith was using or would in the
7  future use Target Telephone No. 2, and (3) that communications would be intercepted by
8  a wiretap. See 18 U.S.C. § 2518(3)(a), (b), (d). Viewing the totality of the circumstances,
9  and in light of the deference that is due, the Court concludes that the court's finding that
10 there was sufficient probable cause for issuance of the initial wiretap order of
11 communications over Target Telephone No. 2 is supported by substantial evidence, and
12 that accordingly, suppression is not warranted.

13     **3.   PRELIMINARY SHOWING OF ENTITLEMENT TO <u>FRANKS</u>**
14           **HEARING**

15     In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court held that defendants
16 may attack the veracity of statements made in an affidavit that purportedly establish
17 probable cause for a search warrant. Id. at 171. The Ninth Circuit has subsequently
18 extended the holding in <u>Franks</u> to cases concerning the showing of probable cause or
19 necessity in wiretap applications, as the requirements for obtaining a wiretap are similar
20 to those for obtaining a search warrant. United States v. Ippolito, 774 F.2d 1482, 1484-85
21 (9th Cir. 1985). If a defendant can show that the affiant deliberately or recklessly made
22 false statements in the affidavit, then the false statements are excluded and the affidavit
23 is re-examined. Franks, 438 U.S. at 171-72. If, upon such reexamination, the content of
24 the affidavit does not support a finding of probable cause or necessity, the defendant is
25 entitled to an evidentiary hearing. Id. However, if the affidavit does support a finding of
26 probable cause and necessity, no hearing is required. Id.

27     Defendant argues that the affidavit in support of the August 30, 2006 application
28 for a wiretap order contains material omissions and/or misrepresentations, which render

the affidavit insufficient to provide probable cause for issuance of the wiretap order. The Court will address each of the challenged statements in turn.

First, defendant argues that the affidavit's reference to a telephone call intercepted over Target Telephone No. 1, during which Smith told an unidentified woman that he would call her from a "new number," suggests that the Target Telephone No. 2 was the "new number." Motions to Suppress, Ex. 2 (Docket No. 71) (Affidavit in Support of Application for Wiretap Order) ¶ 25(a)-(b).[6] However, according to defendant, S.A. Koeppen knew that Target Telephone No. 2 had not been used to call the unidentified woman's telephone number.

The affidavit does not allege that Target Telephone No. 2 had been used to call the unidentified woman's phone number. Considering the reference to the "new number" in context, the Court concludes that S.A. Koeppen's reference does not constitute a misrepresentation.

Second, defendant claims that the affidavit falsely asserts that Target Telephone Nos. 1 and 2 were registered to a fictitious business, AMT & Associates, when information from the California Secretary of State regarding the business was available, but not included in the affidavit.[7]

---

[6] Specifically, defendant attacks the veracity of the following allegations

On July 20, 2006, Target Telephone #1 received an incoming call from an unknown female (UF) utilizing telephone number (562) 989-6572 . . . . Smith told UF that he would call her back from a new number so that she could store the number in her phone. Based on my training, experience, knowledge of this investigation and the above listed telephone call, I believe that Smith was informing UF that he is utilizing a new telephone number.

Motions to Suppress, Ex. 2 (Docket No. 71)(Affidavit in Support of Application for Wiretap Order) ¶ 25(a) (emphasis omitted).

[7] In the affidavit, S.A. Koeppen asserts that "I cannot find any record of an actual AMT & Associates business." Id. ¶ 25(d). S.A. Koeppen further states that

(continued...)

1    The government responds that including information from the Secretary of State
2    about AMT & Associates would not have undermined S.A. Koeppen's conclusion that
3    AMT & Associates was a fictitious business.[8] The government asserts that the affidavit
4    discloses sufficient information about the subscriber address for Target Telephone Nos.
5    1 and 2 to support S.A. Koeppen's conclusion that AMT & Associates was a fictitious
6    business. The government argues that including information from the Secretary of State
7    about AMT & Associates would have only revealed that the business was registered with
8    the Secretary of State, and that Francesca Last of 628 Daisy Avenue, Apartment 325, Long
9    Beach, California, was the business' contact person.

10    S.A. Koeppen's failure to consult the records of the California Secretary of State
11    does not undermine his ultimate conclusion that AMT & Associates was a fictitious
12    business. The affidavit discloses that the subscriber address for Target Telephone No. 1,
13    known to be used by Smith, is 628 Daisy Avenue, Apartment 325, Long Beach, California,
14    which is a multi-story, multi-unit apartment complex. This address is also disclosed to be
15    the subscriber address for Target Telephone No. 2. The affidavit alleges that according
16    to Autotrack and Lexis Nexis, Francesca Last is the resident of the Daisy Avenue
17    apartment. The affidavit notes the last name "Last," and not "Smith," appears on the
18    registry located at the front of the apartment complex. The affidavit states that the utilities

19

20    [7](...continued)
      [B]oth Target Telephone #1 and #2 are subscribed to AMT & Associates,
21    which is possibly a fictitious business about which I have not been able to
22    locate any records, business licenses or information. Based on my training
      and experience, I know that narcotics traffickers frequently utilize fictitious
23    subscriber information in an attempt to thwart law enforcement wire
24    interception attempts.

25    Id. ¶ 74 (emphasis omitted).

26
      [8] However, at the hearing held herein, S.A. Koeppen admitted not only that he did
27    not attempt to obtain information from the Secretary of State about AMT & Associates,
28    but that he could not recall any incident in his experience where an individual registered
      a fictitious corporation with the Secretary of State.

for the Daisy Avenue apartment are in Francesca Last's name.  Further, the affidavit states that in addition to Target Telephone No. 1, at least four additional telephone numbers are subscribed to by AMT & Associates, including Target Telephone No. 2.

Third, defendant asserts that the affidavit falsely alleges that Smith acquired Target Telephone Nos. 1 and 2 at the same time.  Defendant asserts that contrary to this representation, in fact, service on Target Telephone No. 2 was initiated approximately one year prior to the date on which service for Target Telephone No. 1 was initiated. Defendant argues that the fact of simultaneous service initiation undermines S.A. Koeppen's conclusion that Smith was initially using Target Telephone No. 1, and that he subsequently switched to Target Telephone No. 2.

The government responds that documents from Sprint Nextel Communications submitted by defendant show that both Target Telephone Nos. 1 and 2 had an "account establish date" of February 5, 2002, but that the "subscriber initial start date" is June 7, 2002, for Target Telephone No. 2 and October 22, 2003, for Target Telephone No. 1. Opp'n to Mot. to Suppress Wiretap Evidence at 16.  The government asserts that S.A. Koeppen did not "see the latter dates when preparing his affidavit."  Id.  In any event, because the affidavit makes just one reference to this fact, without drawing any conclusions therefrom, the government argues that the statement does not constitute a material misstatement or omission.

That service on Target Telephone No. 1 was initiated after service on Target Telephone 2 refutes the statement that Smith began using Target Telephone No. 1 first. However, it does not undermine S.A. Koeppen's assertions that, in his experience, narcotics traffickers use multiple telephones in furtherance of drug trafficking, or that they often purchase multiple telephones to guard against the risk that one telephone might be comprised.  Notwithstanding the shared subscriber initiation dates, there was sufficient independent evidence to justify issuance of the interception of Target Telephone No. 2. For example, the affidavit discloses that Smith was using Target Telephone No. 1, that both Target Telephone Nos. 1 and 2 were subscribed to by AMT & Associates, and that

1   both Target Telephone Nos. 1 and 2 have made or received calls from phone numbers
2   believed to be used by Smith's mother. Further, the affidavit alleges that toll analysis
3   identified 46 commonly called numbers between Target Telephone Nos. 1 and 2, and that
4   Target Telephone No. 2 made an average of over 200 calls per day during a one-month
5   period of time.

6       Fourth, defendant claims that telephone toll records show that the confidential
7   informant ("CI-1") who purchased cocaine base from Smith had numerous conversations
8   with the user of Target Telephone No. 2. Defendant argues that accordingly, agents
9   should have known that Smith was not using Target Telephone No. 2.

10      In opposition, the government concedes that telephone phone records showed that
11   CI-1 had one contact with the individual using Target Telephone No. 2 at the time that
12   S.A. Koeppen prepared his affidavit. However, the government asserts that S.A. Koeppen
13   was unaware of this contact because "he did not conduct a line-by-line review" of the
14   "voluminous" telephone toll records. Id. at 17. Instead, according to the government, S.A.
15   Koeppen "conducted computer queries, looking for such things as common numbers
16   between Target Telephone Nos. 1 and 2, and contacts between Target Telephone No. 2 and
17   other target subjects." Id. at 17-18.

18      The Court finds that S.A. Koeppen's failure to conduct a line-by-line review of the
19   telephone toll records was not unreasonable. Based on the record before it, the Court
20   concludes that S.A. Koeppen reasonably concluded that Smith was using Target Telephone
21   No. 2.

22      Fifth, defendant claims that the affidavit's assertion that agents placed two "ruse
23   telephone calls" to Target Telephone No. 2 and believed that Smith picked up, is
24   contradicted by telephone toll and cell site records, which (1) do not show that Smith even
25   answered Target Telephone No. 2, and (2) demonstrate that at the time of the calls, Smith
26   was using Target Telephone No. 1. Mot. to Suppress Wire Intercepted Communications
27   at 8-9.

28      The government responds by arguing that the affidavit states that Officer

Christopher Bolt and Officer Thue each made "ruse calls" to Target Telephone No. 2 on July 27, 2006, and August 8, 2006, respectively, and that each officer believed that he recognized the voice of the male answering the phone as Eddie Lee Smith, because that is what Officers Bolt and Thue told S.A. Koeppen. According to the government, it was reasonable for S.A. Koeppen to rely on the officers' voice identifications because the officers had been listening to intercepted calls of Smith over Target Telephone No. 1 for some time. The government further claims that "SA Koeppen also reasonably believed that the officers would have known if Eddie Lee Smith was using Target Telephone No. 1 at the time of the ruse calls to Target Telephone No. 2, because the officers stated that they had each made the ruse calls from the wire room while monitoring the interception over Target Telephone No. 1." Opp'n to Mot. to Suppress Wire Intercepted Communications at 19. The government contends that at the time he prepared the affidavit, S.A. Koeppen did not have toll data or cell site information for Target Telephone No. 2 for the second ruse call on August, 8, 2006, so he could not have known that the toll data or cell site evidence contradicted the assertion that Smith answered Target Telephone No. 2. With respect to Target Telephone No. 1, the government argues that the toll data does not show a conflict because according to the toll data, Target Telephone No. 1 was not in use at the time of the ruse call on July 27, 2006. The government contends that S.A. Koeppen did not review the cell site information for the first ruse call.

It appears that Officers Bolt and Thue were not monitoring calls on Target Telephone No. 1 when making the ruse calls to Target Telephone No. 2, that they did not make these ruse calls from the wire room, and that they represented otherwise to S.A. Koeppen. However, after reviewing S.A. Koeppen's declaration and hearing his testimony, the Court finds that S.A. Koeppen reasonably relied upon the Officer Bolt's and Thue's representations. In light of their representations it was not unreasonable for S.A. Koeppen to fail to review the toll data or cell cite information for the ruse calls. S.A. Koeppen appears to have conveyed the information at issue here believing it to be accurate. See United States v. Perdomo, 800 F.2d 916, 920 (9th Cir. 1986) (stating that

1  "under Franks . . . the veracity of only the affiant must be challenged"); United States v.

2  Kiser, 716 F.2d 1268, 1271 (9th Cir. 1986) ("The offer of proof [for a Franks hearing]

3  must challenge the veracity of the affiant, not that of his informant.").

4  Sixth, defendant challenges the allegation that Target Telephone No. 2 received

5  approximately 6,364 calls, between July 7, 2006, to August 7, 2006, which is an average

6  of 200 calls per day. Defendant argues that although the statement is true, it is misleading

7  because only 2,517 of those calls have time associated with them.

8  In opposition, the government asserts that S.A. Koeppen did not examine how many

9  calls were completed or the length of the conversations.

10  The Court finds that defendant has failed to show S.A. Koppen deliberatively or

11  recklessly attempted to mislead the court when the order for wire interception issued.

12  As stated above, suppression of wiretap evidence may be necessary where the

13  wiretap application contains intentionally or recklessly false information material to the

14  court's probable cause finding. See United States v. Meling, 47 F.3d 1546, 1553 (9th Cir.

15  1995). Here, the Court is unpersuaded that S.A. Koeppen, as the affiant, intentionally or

16  recklessly provided false information in the wiretap order affidavit. The Court therefore

17  denies defendant's request for a Franks hearing. See Franks, 438 U.S. at 1717 (allegations

18  that false statements were made negligently or innocently insufficient to require Franks

19  hearing).

20  **B.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED ON**

21  **SEPTEMBER 4, 2006**

22  Defendant next moves to suppress evidence seized from the Cedar Avenue address

23  on September 4, 2006, arguing that it was unlawfully seized without a search warrant.

24  Defendant argues that the DEA agents and LBPD officers did not have probable cause to

25  enter the apartment located at 2310 Cedar Avenue, Apartment 3, Long Beach, California

26  on September 4, 2006. Defendant argues that the intercepted communication between

27  defendant and Marshall, wherein defendant allegedly instructed Marshall to remove or

28  destroy contraband did not reference the apartment at the Cedar Avenue address, and that

it was not reasonable to assume that defendant was referring to that apartment. Defendant argues that the agents had no information about Marshall, the location of the apartment of which defendant and Marshall were speaking about, or whether there were any drugs at this unknown location.  Defendant claims that the agents had no reason to believe that defendant's reference to a computer was in fact code for narcotics, that Marshall was involved in drug trafficking, or that there were drugs at the Cedar Avenue address. Defendant further argues that if arguendo there was probable cause, there were no exigent circumstances since the DEA and LBPD waited nearly an hour before entering the apartment.

Defendant also argues that the affidavit in support of the search warrant for the Cedar Avenue address contained false statements and omissions. First, defendant claims that the affidavit in support of the warrant failed to disclose that California DMV records indicated that defendant lived at 2369 Olive Avenue, Long Beach, California, and not at the Cedar Avenue address. Defendant argues that the affidavit misstated the Cedar Avenue address, and mistakenly states that defendant was intercepted over Target Telephone No. 1. Further, defendant claims that the affidavit failed to disclose (1) that officers had already entered the apartment without a warrant and conducted a search or seizure, and (2) that the officers had submitted the request for a search warrant to other judicial officers, and had been denied a search warrant.

## 1.    WHETHER THE WARRANTLESS SEARCH WAS LAWFUL

The Fourth Amendment to the United States Constitution protects against unreasonable entry into a person's home for the purpose of arrest or search, and requires the use of warrants.[9]    McDonald v. United States, 335 U.S. 451, 455 (1948).  Thus,

---

[9] The Fourth Amendment provides that,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

(continued...)

1    "'searches and seizures inside a home without a warrant are presumptively unreasonable.'"

2    LaLonde v. County of Riverside, 204 F.3d 947, 954 (9th Cir. 2000) (quoting Payton v. New

3    York, 445 U.S. 573, 590 (1980)). However, "truly exigent circumstances" may justify the

4    warrantless entry into a person's home.   United States v. Karo, 468 U.S. 705, 717-18

5    (1984); see also Mincey v. Arizona, 437 U.S. 385, 393-94 (1978) ("[W]arrants are

6    generally required to search a person's home or his person unless 'the exigencies of the

7    situation' make the needs of law enforcement so compelling that the warrantless search is

8    objectively reasonable under the Fourth Amendment.") (quoting McDonald, 335 U.S. at

9    456). This is true at least where there is probable cause to enter the person's home, i.e., to

10   believe that contraband or evidence of a crime will be found inside of the residence.

11   LaLonde, 204 F.3d at 954. Therefore, to justify a warrantless search the government must

12   show (1) that the officers had probable cause to enter, and (2) that exigent circumstances

13   existed. Id.; United States v. Licata, 761 F.2d 537, 542 (9th Cir. 1985) ("[P]revailing fourth

14   amendment law requires a finding of both probable cause and exigent circumstances to

15   support the warrantless seizure in this case.").

16       To establish probable cause the government must show that there was a "fair

17   probability that contraband or evidence of a crime" was in the residence. See Illinois v.

18   Gates, 462 U.S. 213, 238 (1983); Bailey v. Newland, 263 F.3d 1022, 1032 (9th Cir. 2001)

19   ("Officers have probable cause for a search when 'the known facts and circumstances are

20   sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence

21   of a crime will be found.'") (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

22   "Probable cause requires only a fair probability or substantial chance of criminal activity,

23   and [courts] determine the existence of probable cause by looking at the totality of the

24

─────────────

25       [9](...continued)
         affirmation, and particularly describing the place to be searched, and the
26       persons or things to be seized.
27

28   U.S. Const. amend. IV.

1    circumstances known to the officers at the time." United States v. Alaimalo, 313 F.3d

2    1188, 1193 (9th Cir. 2002); Hopkins v. City of Sierra Vista, 931 F.2d 524, 527 (9th Cir.

3    1991) ("Probable cause requires 'a reasonable belief, evaluated in light of the officer's

4    experience and the practical considerations of everyday life,' that a crime has been, is

5    being, or is about to be committed.") (quoting United States v. George, 883 F.2d 1407,

6    1412 (9th Cir. 1989)).

7         To determine whether exigent circumstances justified a warrantless home entry, a

8    court must ask whether (1) "considering the totality of the circumstances, law enforcement

9    had an objectively reasonable basis for concluding that there was an immediate need to

10   [enter]; and (2) the search's scope and manner were reasonable to meet the need." United

11   States v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008). The Ninth Circuit

13        define[s] exigent circumstances as those circumstances that would cause a

14        reasonable person to believe that entry (or other relevant prompt action) was

15        necessary to prevent physical harm to the officers or other persons, the

16        destruction of relevant evidence, the escape of the suspect, or some other

17        consequence improperly frustrating legitimate law enforcement efforts.

19   United States v. McConney, 728 F.2d 1195, 1199 (9th Cir. 1984). "The government bears

20   the burden of showing the existence of exigent circumstances by particularized evidence."

21   United States v. Tarazon, 989 F.2d 1045, 1049 (9th Cir. 1993); United States v. Dugger,

22   603 F.2d 97, 99 (9th Cir. 1979). Accordingly, "the government must demonstrate specific

23   and articulable facts to justify the finding of exigent circumstances, and this burden is not

24   satisfied by leading a court to speculate about what may or might have been the

25   circumstances." United States v. Driver, 776 F.2d 807, 810 (9th Cir. 1985); United States

26   v. Licata, 761 F.2d 537, 543 (9th Cir. 1985) ("There must exist specific and articulable

27   facts which, taken together with rational inferences, support the warrantless intrusion.")

28   (citations and quotations omitted).

To determine whether exigent circumstances existed the court must view the totality of the circumstances as they were known to the officers at the time of the search or seizure. United States v. Gooch, 6 F.3d 673, 679 (9th Cir. 1993); United States v. Banks, 540 U.S. 31, 36 (2003). As the term "exigency" suggests, the officer must have reasonably believed that "some real immediate and serious consequences [will result] if he [or she] postponed action to get a warrant.'" Welsh v. Wisconsin, 466 U.S. 740, 751 (1984) (quoting McDonald v. United States, 335 U.S. 451, 460 (1948) (Jackson, J., concurring)). "[T]he critical time for determining whether any exigency exists is the moment the officer makes the warrantless entry." United States v. Johnson, 256 F.3d 895, 907 (9th Cir. 2001). Failure to make a "good faith attempt to obtain a telephonic warrant or to present evidence showing that a telephonic warrant was unavailable ordinarily requires suppression." United States v. Tarazon, 989 F. 2d 1045, 1050 (9th Cir. 1993).

### a.   PROBABLE CAUSE

The Court concludes that the officers had probable cause to believe that there was contraband in the Cedar Avenue address.

First, it could have reasonably appeared to a prudent law enforcement officer that defendant resided at the Cedar Avenue address. On September 2, 2006, at approximately 6:01 p.m., officers intercepted the following call on Target Telephone No. 2:

[FOWLKES]:          HELLO.
                    (ANSWERING MACHINE CAN BE HEARD SAYING,
                    "HELLO, NO ONE IS AVAILABLE TO TAKE YOUR
                    CALL.  PLEASE LEAVE A MESSAGE AFTER THE
                    TONE."
[FOWLKES]:          HEY JOE. THIS IS MARK OUT AT, UH, 2310 CEDAR,
                    APARTMENT 3.  GIVE ME CALL BACK AND LET
                    ME KNOW IF YOU WANT ME TO SEND THE RENT
                    OFF TODAY OR YOU COMING OUT TO PICK IT UP.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> LET ME KNOW WHAT YOU WANT ME TO DO.
> TODAY'S THE SECOND.   HAVE A GOOD DAY.
> GIVE ME A CALL.

Opp'n to Mot. to Suppress re: Sept. 4, S.A. Koeppen Decl. ¶ 4, Ex. A.

Defendant's statement that he was "out at, uh, 2310 Cedar, Apartment 3," coupled with his inquiry about the rent, could reasonably lead the officers to conclude that defendant lived at this location. Id. A prudent law enforcement officer could have reached this conclusion notwithstanding the fact that defendant's California driver's license lists 2369 Olive Avenue, Long Beach, California, as his residence. The officers' conclusion was supported by their surveillance of the Olive Avenue address, during which they did not observe any person matching defendant's or Smith's description.

Second, the officers could have reasonably believed that defendant engaged in narcotics trafficking.   On September 3, 2006, Sgt. Gibbs, Officer Thue, and others conducted surveillance of defendant.   They did so because S.A. Koeppen informed them that defendant was going to engage in a narcotics transaction.[10]   During the surveillance, Officer Thue observed Watson and a black male, later identified as Shaun Durand Lee, approach a gold Dodge Intrepid driven by defendant at a predetermined meeting place.[11] Lee and Watson approached the passenger side of defendant's car.   Officers observed Lee reach into his pocket, then lean into defendant's car.   Based on this observation, officers believed that a narcotics transaction had just taken place.   After Lee and Watson walked away from defendant's car, Sgt. Gibbs and Officer Thue approached them.   Officer Thue believed that Lee had an object clenched in his hand.   Lee attempted to place this object in

[10] S.A. Koeppen's statement was in turn based on an intercepted telephone call in which a woman later identified as Elaine Watson called defendant to arrange a drug transaction.

[11] On previous surveillance of defendant, Officer Gibbs had observed defendant driving a gold Dodge Intrepid.

his mouth. The item fell to the ground, and Lee tried to flee. The officers ultimately apprehended Lee, and seized the item that had fallen to the ground. The item was later confirmed to be .61 grams of crack cocaine.

Finally, intercepted calls over Target Telephone No. 2 on September 4, 2006, could have reasonably lead officers to conclude that there were drugs present at defendant's Cedar Avenue residence. Direct evidence that drugs are present at a particular location is not required to establish probable cause. United States v. Jackson, 756 F.2d 703, 705 (9th Cir. 1985). "In the case of drug dealers, evidence is likely to be found where the dealers live." United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).

## b.    EXIGENT CIRCUMSTANCES

On September 4, 2006, agents intercepted wire communications in which defendant is heard making the following statements:

"IT'S A 911 . . . . THE HOMIE SAID THE POLICE IS OUTSIDE IN THE BACK . . . . I WAS GONNA TELL YOU TO TAKE THAT SHIT OVER TO KEISHA'S HOUSE . . . . THE UNDERCOVER, LIKE, THREE DIFFERENT CARS, KEEP HITTING THE ALLEY . . . . THEY JUST CHIRPED ME AND JUST TOLD ME TO WATCH OUT." Opp'n to Mot. to Suppress re: Sept. 4, S.A. Koeppen Decl. ¶ 5, Ex. B.

"HEY, PAPA GONE, MAN. HE'S ON OLIVE. SO UH, WHEN YOU COME BACK, YOU SHOULD MOVE THAT COMPUTER AND THE REST OF ALL THAT YOU KNOW, JUST GET EVERYTHING OUT OF HERE CAUSE I DON'T KNOW WHAT'S UP . . . . HEY, THIS NIGGA WENT TO JAIL FOR SOME, UH . . FOR GTA AND SAID THIS MOTHER FUCKER'S WAS IN THERE ASKING HIM ABOUT ME." Id. ¶ 6, Ex. C.

"I'M NOT GONNA GIVE THEM SHIT TO PUT TOGETHER ON ME. I'M

FITIN TO TRASH THIS PHONE AND I'M OUTTA HERE . . . . JUST, JUST IN, JUST IN CASE OF SHIT LIKE THIS GO DOWN. I ALWAYS HAD A BACKUP PLAN." Id. ¶ 7, Ex. D.

Viewing the totality of the circumstances in this case as they would reasonably appear to a prudent law enforcement officer, the Court cannot conclude that it was unnecessary to enter and secure apartment 3 to prevent defendant from destroying or removing contraband. See e.g., Segura v. United States, 468 U.S. 796, 810 (1984) ("We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."). Moreover, the passage of time did not negate the exigent circumstances. Approximately one-hour elapsed between defendant's last communication with "Robo," and when the officers kicked in the door to apartment 3. The delay while the officers coordinated their efforts "did not dissipate the exigency." United States v. Lindsey, 877 F.2d 777, 782-83 (9th Cir. 1989) (holding that one hour delay did not negate the exigency).

### 2. WHETHER SEIZURE OF THE HANDGUN WAS LAWFUL

That evidence is in plain view does not justify its warrantless seizure. United States v. Murphy, 516 F.3d 1117, 1121 (9th Cir. 2008). "[E]ven [when] contraband plainly can be seen and identified from outside the premises, a warrantless entry into those premises to seize the contraband would not be justified absent exigent circumstances." G & G Jewelry, Inc. v. City of Oakland, 989 F.2d 1093, 1101 (9th Cir. 1993). In this case, the Court has found that considering the totality of the circumstances the officers reasonably believed that there was an immediate need to enter apartment 3 in order to prevent defendant from destroying evidence therein contained. Once lawfully inside the apartment, it was proper for the officers to seize evidence in plain view, including the handgun. See United States v. Astorga-Torres, 682 F.2d 1331, 1335 (9th Cir. 1982).

### 3.    INDEPENDENT SOURCE

In <u>Segura</u>, police investigating drug activity illegally entered Segura's home without a warrant, and then stayed in the apartment for nineteen hours, purportedly to secure the premises so that evidence would not be destroyed, waiting for a warrant. <u>Segura</u>, 468 U.S. at 818-19.   Once the officers were notified that a warrant had been obtained, they conducted a search of the apartment. <u>Id.</u> at 801. The United States Supreme Court refused to suppress evidence obtained pursuant to that search even though the government conceded that the initial entry was illegal.  The Court held

> the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385 (1920).

<u>Id.</u> at 799; <u>see also</u> <u>United States v. Murray</u>, 487 U.S. 533 (1988); <u>United States v. Hill</u>, 55 F.3d 479, 481 (9th Cir. 1995) ("[For the warrant] [t]o be untainted by this prior search, the officers' decision to seek the warrant must not have been 'prompted by what they had seen during [the earlier unlawful search].'") (quoting <u>Murray</u>, 487 U.S. at 542).

Assuming <u>arguendo</u> that the initial entry into the apartment was not justified by exigent circumstances, and therefore illegal, the officers had an independent source for the evidence obtained at the apartment, namely the search conducted pursuant to the later-obtained lawful warrant. <u>See</u> discussion <u>infra</u> sec. III.B.4. (concluding that affidavit in support of search warrant did not rely upon observations made during warrantless entry to establish probable cause).

1

### 4.    WHETHER THE SEARCH WARRANT WAS VALIDLY ISSUED

2
3
4
5
6
7
8
9
10

Defendant alleges that the affidavit in support of the search warrant for the Cedar Avenue address failed to establish probable cause, and that it contained false and misleading statements. Defendant first asserts that the affidavit failed to disclose that California DMV records indicated that defendant resided at 2369 Olive Avenue in Long Beach, California, and not at the Cedar Avenue address. The omission of this information was not relevant to the finding of probable cause because, for the reasons stated above, the intercepted call on September 2, 2006, could have reasonably led officers to believe that defendant lived at apartment 3. Further, the officers conducted surveillance of the Olive Avenue address for two days, and never observed defendant at that address.

11
12
13
14
15
16
17
18
19

Next, defendant alleges that the affidavit failed to notify the judge that issued the warrant, that officers had seized and searched apartment 3 prior to obtaining a search warrant. The Court is unpersuaded that the officers searched the apartment without a warrant. In any event, the affidavit supporting the search warrant contains no information regarding what was observed when the officers secured apartment 3. See e.g., United States v. Murray, 487 U.S. 533, 542-43 (1988) (where officers did not disclose their warrantless entry to magistrate judge who issued search warrant, which entry was determined to be illegal, remanding to district court to determine whether the officers relied upon observations made during that illegal entry to secure the search warrant).

20
21
22

Defendant further argues that the affidavit failed to disclose that the officers had unsuccessfully attempted to obtain a search warrant for apartment 3 from other judicial officers. There is, however, no evidentiary support for this contention.

23
24
25
26
27
28

Finally, defendant argues that in two instances the affidavit erroneously alleges that defendant was overheard on Target Telephone No. 1, rather than Target Telephone No. 2. Defendant also contends that the affidavit does not properly describe the Cedar Avenue address. It appears that defendant is referring to the following allegations in the affidavit: (1) "On September 2, 2006, at approximately 6:01 p.m., Target Telephone #1 placed an outgoing call to telephone number (714) 641-3556"; (2) "On September 4, 2006, at

1   approximately 2:05 p.m., Target Telephone #1 received an incoming telephone call from

2   Push to Talk telephone number 31060101011159376, utilized by a female only known at

3   the time as TOYA"; (3) "I believe that Joe is FOWLKES's landlord and FOWLKES is

4   telling Joe that he resides at 2310 Apartment Avenue, Apartment 3, Cedar Avenue, Long

5   Beach, CA"; and (4) "2310 Apartment 3 Cedar Avenue." Motions to Suppress, Ex. 8

6   (Docket No. 71) (Affidavit in Support of Search Warrant) at 437-38. Other portions of the

7   affidavit accurately disclose that a court had authorized interception of wire

8   communications over Target Telephone No. 2. Further, the affidavit elsewhere properly

9   identifies Target Telephone No. 2, and the substance of the intercepted calls.

10   It appears that the references to "2310 Apartment Avenue" and "2310 Apartment 3

11   Cedar Avenue" are typographical errors.

12

13   [T]he test for determining the sufficiency of the warrant description is whether

14   the place to be searched is described with sufficient particularity to enable the

15   executing officer to locate and identify the premises with reasonable effort,

16   and whether there is any reasonable probability that another premise might be

17   mistakenly searched.

18

19   United States v. Turner, 770 F.2d 1508, 1510 (9th Cir. 1985) (internal quotations omitted).

20   Although "2310 Apartment Avenue, Apartment 3, Cedar Avenue," and "2310 Apartment

21   3 Cedar Avenue" is technically deficient, the Court finds that because the address is

22   otherwise accurately identified in both the affidavit and the warrant, the executing officer

23   would be able to, and in fact did, locate and identify the premises to be searched. See e.g.,

24   United States v. McCain, 677 F.2d 657, 659 (8th Cir. 1982); Turner, 770 F.2d at 1511.

25   Additionally, because apartment 3 had been under surveillance and was in fact being

26   secured by officers who applied for and executed the search warrant, there was little chance

27   that the wrong premises would be searched. McCain, 677 F.2d at 661 ("Mistake is less

28   likely when the premises have been under surveillance, as they were here for over a year

1    before the search. Moreover, a mistaken search is unlikely where, as here, the same officers

2    both apply for and execute the warrant.") (internal citations omitted); Turner, 770 F.2d at

3    1511 ("[T]here was virtually no chance that the executing officer would have any trouble

4    locating and identifying the premises to be searched, or that he would mistakenly search

5    another house" where "the house had been under surveillance before the warrant was

6    sought; the warrant was executed by an officer who had participated in applying for the

7    warrant and who personally knew which premises were intended to be searched; and the

8    premises that were intended to be searched were those actually searched.").

9        Based on the foregoing, the Court finds that although the affidavit in support of the

10   search warrant contained some omissions and inaccurate statements, there was nonetheless

11   probable cause for issuance of the warrant to search the Cedar Avenue address. See Illinois

12   v. Gates, 462 U.S. 213, 230 (1983).

13       **C.    MOTION TO SUPPRESS EVIDENCE SEIZED ON SEPTEMBER 13,**

14            **2006**

15       Defendant argues that the LBPD officers unlawfully arrested him without probable

16   cause because neither driving a car with expired registration, nor possessing less than 28.5

17   grams of marijuana are offenses for which arrest is justified. Defendant further argues that

18   the white substance on the seats of the Dodge Intrepid was not in plain view because it

19   could not have been visible to the officers on the scene. Finally, defendant argues that the

20   officers conducted an unlawful body cavity search.

21       **1.    WHETHER THE OFFICERS HAD PROBABLE CAUSE TO**

22            **STOP DEFENDANT**

23       An officer may reasonably make a traffic stop when the officer has "probable cause

24   to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810

25   (1996); see also, United States v. Chavez-Valenzuela, 268 F.3d 719, 723 (9th Cir. 2001).

26   Probable cause is a "fluid" concept, depending on an "assessment of probabilities in

27   particular factual contexts." Illinois, 462 U.S. at 232. Because the subjective intent of the

28   officer is irrelevant, "[t]he fact that the alleged traffic violation is a pretext for the stop is

1    irrelevant, so long as the objective circumstances justify the stop." United States v.

2    Wallace, 213 F.3d 1216, 1219 (9th Cir. 2000).

3        California Vehicle Code § 4000(a)(1) requires a vehicle to be currently registered,

4    Cal. Veh. Code § 4601(a) requires the vehicle's registration to be renewed annually prior

5    to the expiration of the registration year, and Cal. Veh. Code § 5204(a) requires that

6    "current month and year tabs shall be attached to the rear license plate attached to the

7    vehicle." An officer who observes a car without a current tab has reasonable suspicion to

8    believe that a traffic violation has occurred. See People v. Saunders, 38 Cal. 4th 1129,

9    1135 (2006). Officer Duncan observed an expired temporary operating permit from the

10   California DMV on the Dodge Intrepid that defendant was driving. Duncan then confirmed

11   with dispatch that the Dodge Intrepid's registration had expired. Duncan therefore

12   reasonably, and in fact correctly, believed that a traffic violation had occurred.

13                   **2.    WHETHER THE OFFICERS LAWFULLY SEIZED THE**

14                        **MARIJUANA ND COCAINE BASE**

15       Warrantless searches are presumptively unconstitutional, unless they fall within the

16   bounds of some exception to the warrant requirement. One such exception is known as the

17   "automobile exception," pursuant to which police officers may "conduct a warrantless

18   search of a vehicle if they have probable cause to believe that it contains contraband."

19   United States v. Pinela-Hernandez, 262 F.3d 974, 977-78 (9th Cir. 2001) ("This rule is

20   known as the 'automobile exception' to the general rule that the police must obtain a

21   warrant before executing a search."); see also California v. Acevedo, 500 U.S. 565, 570-71

22   (1991) (under the automobile exception to the warrant requirement, police officers may

23   search an automobile and all containers found inside without a warrant if they have

24   probable cause to believe that the automobile contains evidence of a crime).[12] There is a

25   _____

26       [12] The automobile exception also applies to containers within a vehicle. United

27   States v. Ross, 456 U.S. 798, 824 (1982) ("The scope of a warrantless search of an
     automobile thus is not defined by the nature of the container in which the contraband is

28   secreted. Rather, it is defined by the object of the search and the places in which there is
                                                                    (continued...)

"two-fold" rationale for this exception: "the expectation of privacy in one's vehicle is less than in one's home, and the mobility of vehicles necessitates faster action on the part of law enforcement officials." Pinela-Hernandez, 262 F.3d at 978.

Probable cause exists when police officers possess "'reasonable trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense.'" United States v. Del Vizo, 918 F.2d 821, 825 (9th Cir. 1990) (quoting United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1296 (9th Cir. 1988)). Whether probable causes exists is based on the "totality of the circumstances" known to the arresting officers. United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986). Moreover, "law enforcement officers may draw upon their experience and expertise in determining the existence of probable cause." United States v. Garza, 980 F.2d 546, 550 (9th Cir. 1992). While "[c]onclusive evidence of guilt is not necessary to establish probable cause," "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." McKenzie v. Lamb, 738 F.2d 1005, 1007 (9th Cir. 1984). Finally, under the collective knowledge doctrine, a court "looks to the collective knowledge of all the officers involved in the criminal investigation." United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007).

On September 13, 2006, Sgt. Gibbs surveilled defendant's Cedar Avenue address. Sgt. Gibbs observed defendant exit the apartment building through a rear entrance, and enter the gold Dodge Intrepid that Sgt. Gibbs had previously seen defendant drive. Sgt. Gibbs followed defendant in his car. Defendant stopped to pick up a black male, later identified as Kerry Young. Defendant drove to (or near) the northeast corner of Elm Avenue and 11th Street, and parked alongside the curb. Det. Robert Miller then arrived to assist Sgt. Gibbs. From less than a hundred yards away, the officers witnessed an

---

[12](...continued)
probable cause to believe that it may be found."); Wyoming v. Houghton, 526 U.S. 295, 301 (1999) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.") (quoting Ross, 456 U.S. at 825).

1  unidentified black female approach defendant's car, and lean into the driver's side window

2  to engage in a conversation for several minutes. After the unidentified black female walked

3  away, an unidentified black male walked up to defendant's car. He reached into the car

4  with his left hand through the open window, pulled it out, and looked into his hand with

5  the palm facing upward. The unidentified black male then walked away from defendant's

6  car. Based on their prior experiences, these observations, and their knowledge of the

7  investigation, Sgt. Gibbs and Det. Miller concluded that defendant had just engaged in a

8  narcotics transaction with the unidentified male. The Dodge Intrepid then pulled away

9  from the curb, and drove back into traffic.

10  Sgt. Gibbs then decided to perform a traffic stop, and requested over the police radio

11  that a marked patrol car pull over the Dodge Intrepid for a traffic violation. Officers

12  Duncan and King responded to this request. After pulling up behind defendant, Officer

13  Duncan observed a red temporary operating permit in the left-hand corner of the back rear

14  window. According to Duncan, the number on the temporary operating permit coincided

15  with the previous month, thereby indicating that the permit had expired. At approximately

16  the same time that the officers observed the expired temporary operating permit, they

17  radioed dispatch to run a search of the Dodge Intrepid's license plate; dispatch confirmed

18  that the vehicle's registration had in fact expired. The officers then signaled defendant to

19  pull over by turning on the lights of their marked patrol car.

20  After defendant stopped, Officer Duncan approached the passenger side of the Dodge

21  Intrepid, and Officer King approached the driver's side. The officers ordered both

22  defendant and passenger Young to exit the car.[13] At or about this time, Sgt. Gibbs and Det.

23  Miller arrived on scene. According to Sgt. Gibbs, when he arrived on scene the driver's

24

25  [13] "[I]t is well established that an officer effecting a lawful traffic stop may order the
26  driver and the passengers out of a vehicle." United States v. Williams, 419 F.3d 1029,
    1030 (9th Cir. 2005), cert. denied, 126 S. Ct. 840 (2005); see also Maryland v. Wilson,
27  519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may
    order passengers to get out of the car pending completion of the stop."); Pennsylvania v.
28  Mimms, 434 U.S. 106, 108-11, (1977) (per curiam).

side car door was ajar.[14]  Det. Miller asked defendant if there were drugs in the car, and defendant responded "no."  Det. Miller also asked defendant permission to search the car. However, defendant denied his request.  At some point thereafter, Sgt. Gibbs and Det. Miller observed small, off-white rock-like chips on the driver and passenger seats of the car, in plain view.  See Evidentiary Hearings re: Motions to Suppress (Docket No. 126), Ex. 107 (photograph taken 9/13/06).  Det. Miller also saw a green, leaf-like substance inside of a clear bag in the side panel of the driver's side door, which had allegedly been left ajar after Officer King ordered defendant out of the vehicle.  Det. Miller informed defendant that he believed there was marijuana and cocaine in the car.  Defendant responded, "That ain't nothing but powered sugar from a donut I got at Winchell's this morning."  Opp'n to Mot. to Suppress re: Sept. 4, Declaration of Detective Richard Miller ("Det. Miller Decl.") ¶ 6.

The Court finds that the officers had probable cause to search the Dodge Intrepid and seize its contents.  The officers prior experience, and collective knowledge of the investigation of defendant, which included interception of telephone calls and surveillance, could have reasonably led them to suspect that defendant was trafficking drugs.[15]

---

[14] Defendant claims that he closed the driver's side door after exiting the vehicle. Assuming arguendo that he did, the officers nonetheless had sufficient probable cause to search the car after they observed what appeared to be cocaine on the seats.  This search would have led the officers to find the marijuana in the driver's side panel door.  See United States v. Ross, 456 U.S. at 824 (stating that under the automobile exception to the warrant requirement officers may search every part of the vehicle that might conceal the object of their search).

[15] There is no dispute that prior to arresting defendant, Officer Duncan had no knowledge of the investigation of defendant.  It is undisputed that Officer Duncan did not see the drugs in the car, and that Sgt. Gibbs did not see the marijuana in the door panel. Further, it is clear that prior to arresting defendant, the officers did not share all of their knowledge and observations concerning defendant with one another.  However, because the officers were acting in concert, as a team, the collective knowledge doctrine applies. Thus, probable cause can be based on their pooled knowledge and observations.  United States v. Ramirez, 473 F.3d 1026, 1037 (9th Cir. 2007) ("We are satisfied that the
(continued...)

Moreover, once the officers observed what they believed to be marijuana and rock cocaine in plain view, when considered along with rational inferences that can be drawn from the foregoing, the officers had more than sufficient cause to justify the search and seizure of the contents of Dodge Intrepid.[16]

### 3.   WHETHER DEFENDANT'S ARREST WAS LAWFUL

A warrantless arrest must be supported by probable cause.   See Michigan v. Summers, 452 U.S. 692, 700 (9th Cir. 1981).  Probable cause is evaluated according to the "totality of the circumstances."  Id. at 230.  The inquiry begins from the point of arrest, "prior to any search conducted incident to the arrest." United States v. Del Vizo, 918 F.2d 821, 825-26 (9th Cir. 1990).  The determination "requires a 'practical, common-sense' decision." United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005).  Indeed, "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (9th Cir. 1983).

As stated above, the officers' surveillance of defendant led them to believe that defendant was trafficking drugs. Sgt. Gibbs and Det. Miller observed marijuana in door panel of the driver's side door, and a white, rock-like substance that they believed to be

---

[15](...continued)
collective knowledge doctrine includes no requirement regarding the content of the communication that one officer must make to another. Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.").

[16] At the hearing held herein, defendant testified that after arriving on scene, Sgt. Gibbs walked up to defendant's car and immediately began a search of its contents. However, the Court finds Officer Duncan's, Sgt. Gibbs', and Det. Miller's representations about what transpired on September 13, 2006 to be credible.  The Court is therefore unpersuaded that the officers searched the car prior to seeing contraband in plain view.

cocaine on the seats of defendant's car.[17]  Further, Gibbs claims that passenger Young informed him that just prior to pulling over, defendant put a bag down his pants.  See United States v. Butler, 74 F.3d 916, 920 (9th Cir. 1996) (stating that probable cause may be based upon hearsay statements).  After Det. Miller informed defendant that he could see these objects in defendant's car, Sgt. Gibbs directed Officer Duncan to handcuff and arrest defendant for felony possession of cocaine base, and possession of marijuana.[18]

Possession of cocaine is a felony for which arrest is proper.  Further, the Ninth Circuit has recently recognized that

> [a]lthough California law requires release after an arrest for violation of the statute prohibiting possession of not more than 28.5 grams of marijuana after presenting satisfactory identification, by its terms, 'in which a person is arrested for a violation of this subdivision,' the statute contemplates that arrest for violation of the subdivision is permissible.

United States v. McCall, 2008 U.S. App. LEXIS 5440, at *3 (9th Cir. Mar. 5, 2008).

The Court concludes that based on their experiences, prior observations, and collective knowledge of the investigation, the officers could have reasonably believed that the substance on the seats of the car was crack cocaine, and that the substance in the panel

---

[17] Defendant argues that the substance on the seat of the car was too small to have been visible to the officers who were standing outside of the car.  The Court, however, finds the officers testimony that they observed the substance while standing outside of the car to be credible.  Although the photographs show that the substance was small in size, the Court cannot conclude that the officers could not have observed the white substance against the grey of defendant's car seats.  Further, it is undisputed that Det. Miller asked defendant about the substance during the traffic stop.

[18] After the white, rock-like substance was tested, it was determined that the substance was approximately 5.6 grams cocaine base and residue.  Testing further determined that the green, leaf-like substance was .16 grams marijuana.

37

of the driver's side door was marijuana.[19]

### 4.   WHETHER THE SEARCH OF DEFENDANT'S BODY WAS LAWFUL

#### a.   STRIP SEARCH

Detention facility administrators are entitled to deference in enacting and executing policies that are aimed at maintaining internal security, even where these policies limit the rights of convicted prisoners and/or pretrial detainees. Bell v. Wolfish, 441 U.S. 520, 547 (1979).  "However, this does not mean that a blanket policy is constitutionally acceptable simply by virtue of [detention facility] officials' invocation of security concerns." Way v. County of Ventura, 445 F.3d 1157, 1161 (9th Cir. 2006).  To be constitutional, a blanket strip search policy must be "'reasonably related' to the [detention facility's] interest in maintaining security." Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 713 (9th Cir. 1989) (quoting Bell, 441 U.S. at 540).  A court must therefore balance "'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" Way, 445 F.3d at 1160 (quoting Bell, 441 U.S. at 599.

Thus, in Kennedy the Ninth Circuit held that the Los Angeles Police Department's policy of performing strip searches and visual body cavity searches of all felony arrestees without considering the crime charged and circumstances surrounding the arrest was unconstitutional. Kennedy, 901 F.2d at 714 (involving felony grand theft); see also Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir. 1991); John Wesley Hall, 25 Search and Seizure § 25.7 ("Detainees simply cannot be strip searched under a blanket policy."). Courts have also invalidated blanket strip search policies as applied to arrestees for traffic violations or minor misdemeanors. See Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir.

---

[19] Defendant argues that testing shows that the substance on the seat of the car was residue, and not cocaine base.  Assuming arguendo that defendant is correct, the officers nonetheless lawfully arrested defendant based on their reasonable belief that the substance was cocaine .

1984) ("We hold that arrestees for minor offenses may be subjected to a strip search only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband or suffering from a communicable disease."); see e.g. O'Brien v. Woodbury Heights, 679 F. Supp. 429, 432 (D. N.J. 1988) (disorderly conduct); Logan v. Shealy, 660 F.2d 1007, 1013-14 (4th Cir. 1981) (driving while intoxicated), cert. denied, 455 U.S. 942 (1982); Stewart v. Lubbock County, 767 F.2d 153, 155 (5th Cir. 1985) (public intoxication and issuing a bad check); Jones v. Edwards, 770 F.2d 739, 741-42 (8th Cir. 1985) (leash law violation); Hill v. Bogans, 735 F.2d 391, 394-95 (10th Cir. 1984) (bench warrant for failure to appear on a traffic violation).  On the other hand, courts have upheld such policies as applied to arrestees charged with crimes involving contraband, see e.g. United States v. Klein, 522 F.2d 296, 300-01 (1st Cir. 1975) (distributing cocaine), or weapons and/or violence, see e.g., Dufrin v. Spreen, 712 F.2d 1084, 1087-89 (6th Cir. 1983) (felonious assault); Dobrowolskyj v. Jefferson County, 823 F.2d 955, 957-59 (6th Cir. 1987) (misdemeanor menacing), cert. denied, 484 U.S. 1059 (1988); United States v. Tillery, 332 F. Supp. 217, 219 (E.D. Pa. 1971) (bank robbery involving shooting of teller), aff'd, 468 F2d 381 (3d Cir. 1972); Thompson v. Los Angeles, 885 F.2d 1439, 1446-47 (9th Cir. 1989) (grand theft auto sufficiently associated with violence).

Defendant here challenges the LBPD's blanket strip search policy.  The LBPD's blanket strip search policy provides that all "[f]elony prisoners shall be strip-searched if arrested for qualifying offenses as indicated in 4030(f)CPC."[20]  Motions to Suppress

---

[20]  California Penal Code § 4030(f) provides:

> No person arrested and held in custody on a misdemeanor or infraction offense, except those involving weapons, controlled substances or violence nor any minor detained prior to a detention hearing on the grounds that he or she is a person described in Section 300, 601 or 602 of the Welfare and Institutions Code, except for those minors alleged to have committed felonies or offenses involving weapons, controlled

(continued...)

(Docket No. 71), Ex. 10 (LBPD Inmate Processing Procedure Regarding Strip Searches) at 11. However, because the Court finds that the strip search of defendant did not violate his Fourth Amendment rights, the Court declines to decide whether LBPD's policy is constitutional. Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 715 (9th Cir. 1989) ("[A] search, although not supportable under an institutional policy, is not per se unconstitutional."). In this case, the officers had a particularized and reasonable suspicion to justify a strip search/visual body cavity search incident to defendant's arrest and booking. Specifically, the officers prior experiences, collective knowledge and belief that defendant was involved in drug trafficking,[21] and their belief that defendant was concealing contraband inside of his pants,[22] could have reasonably led them to conclude that defendant

---

[20](...continued)

> substances or violence, shall be subjected to a strip search or visual body cavity search prior to placement in the general jail population, unless a peace officer has determined there is reasonable suspicion based on specific and articulable facts to believe such person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband. No strip search or visual body cavity search or both may be conducted without the prior written authorization of the supervising officer on duty. The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor.

[21] See Way v. County of Ventura, 445 F.3d 1157, 1161 (9th Cir. 2006) ("We do not disagree that in some cases, the charge itself may give rise to reasonable suspicion."); Warner v. Grand County, 57 F.3d 962, 964 (10th Cir. 1995) (finding that possession of marijuana provided officers with reasonable suspicion to justify strip search); Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986) (stating that crime charged can provide "particularized suspicion" for strip search; Mary Beth G. v. City of Chi., 723 F.2d 1263, 1273 (7th Cir. 1983) (noting that narcotics violations "are the kinds of crimes . . . that might give rise to a reasonable belief that the . . . arrestee was concealing an item in a body cavity").

[22] See United States v. Butler, 74 F.3d 916, 920 (9th Cir. 1996) (stating that probable cause may be based upon hearsay statements).

1    was concealing drugs on his body. <u>See</u> <u>Kennedy</u>, 901 F.2d at 715. The officers conducted

2    the strip search in a private area designated for such searches. Further, as discussed below,

3    it does not appear to the Court that the officers acted indecently or inappropriately during

4    the strip search.

5                        **b.     BODY CAVITY SEARCH**

6            Defendant next argues that the officers conducted an unlawful body cavity search.

7    The parties' accounts of what transpired during the search of defendant's body differ

8    considerably.  Sgt. Gibbs claims that after defendant bent over, he observed an object

9    protruding from defendant's anus. According to Sgt. Gibbs, defendant attempted to use his

10   fingers to push the object farther into his anus.  Sgt. Gibbs fired his taser gun, striking

11   defendant in the lower back. Sgt. Gibbs claims to have then pulled the protruding object

12   out of defendant's anus. Under defendant's version of the events, after he bent over, Sgt.

13   Gibbs inserted his fingers into defendant's anus. Defendant argues that Sgt. Gibbs, who

14   was not authorized to conduct body cavity searches, therefore conducted an unlawful

15   search.

16           After carefully considering the record before it, which includes the testimony of both

17   Sgt. Gibbs and defendant, the Court finds Sgt. Gibbs' representation that he saw the bag

18   protruding from defendant's anus to be credible.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    CONCLUSION

Based on the foregoing, the Court hereby DENIES defendant's motions to suppress (1) wire intercepted communications, (2) evidence seized on September 4, 2006, and (3) evidence seized on September 13, 2006.

IT IS SO ORDERED.

Date: June 10, 2008

_Christina A. Snyder_

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE